UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| In re DONALD C. KUPPERSTEIN, ) | Civil No. 18-11772-LTS and |
| ) | Civil No. 18-11851-LTS |
| Appellant. ) | |

ORDER ON BANKRUPTCY APPEALS

April 22, 2020

SOROKIN, J.

Donald C. Kupperstein has appealed two decisions by the United States Bankruptcy Court for the District of Massachusetts: one granting relief from the automatic stay with respect to certain actions pending in state courts, and another denying Kupperstein's request for contempt sanctions against a creditor he alleged had violated the automatic stay. The two appeals were consolidated. For the reasons that follow, both Bankruptcy Court orders are AFFIRMED.

I.   BACKGROUND[1]

The sordid and convoluted path to the rulings at issue here began in November 2014, when Kupperstein and Thomas Sheedy visited Carol Thibodeau in Rhode Island. They persuaded Thibodeau to sell Sheedy a home in Norton, Massachusetts that had belonged to her deceased father. The "price" they negotiated was something less than $100, plus a promise to resolve a local tax lien just shy of $3,400. The deal was struck without consulting Thibodeau's lawyer, who was assisting her in her role as the personal representative of her father's estate, and

---

[1] The First Circuit previously recounted the series of events that led to Kupperstein's appeal. See Kupperstein v. Schall (In re Kupperstein), 943 F.3d 12, 15-19 (1st Cir. 2019). This Court incorporates that recitation by reference in its entirety and summarizes only those facts necessary to resolve Kupperstein's pending appeals.

without regard for a second lien on the home—about which Kupperstein knew—securing a debt of more than $191,000 that the Estate owed the Massachusetts Executive Office of Health and Human Services ("MassHealth" or "EOHHS").

When Thibodeau's lawyer learned of the "sale" shortly after it occurred, he promptly contacted Kupperstein to inform him that any sale of the property without satisfying the MassHealth lien, and without approval from the Bristol County Probate Court, was invalid. Kupperstein ignored this admonishment, renovated and leased the Norton home, and kept the rent, all while EOHHS and the Estate embarked on an arduous campaign to reclaim what was rightfully theirs—a campaign which Kupperstein sought to frustrate at every turn.

The seeds of this dispute, planted by Kupperstein in Thibodeau's living room, bloomed into a number of separate lawsuits in various Massachusetts courts and, ultimately, into federal bankruptcy proceedings.  The state proceedings relevant here are: 1) an action filed in Suffolk County Superior Court by EOHHS against Kupperstein, Sheedy, and Thibodeau in July 2015 challenging the sale of the Norton home, Doc. No. 11[2] at 137-51; 2) the reopening of Bristol County Probate Court proceedings regarding the Estate via a petition by EOHHS for authorization to sell the Norton home to satisfy the MassHealth lien, id. at 187-95; and 3) an action Kupperstein filed in Land Court to try title to the Norton home, id. at 31-39.[3]

---

[2] The designated record for Kupperstein's appeals to this Court appears as Document 11 on the electronic docket in Civil Action No. 18-11772.  All "Doc. No." citations within this decision refer to the electronic docket in that, Kupperstein's earlier-filed, action.

[3] There also was an action in Bristol County Superior Court, brought by a person who had attempted to purchase the Norton home from Sheedy.  Doc. No. 11 at 201-08.  That case survived summary judgment but was later dismissed without a trial.  Id. at 207.  In connection with that action, Kupperstein succeeded in getting a writ of execution for $250,000 entered in his favor with respect to the Norton home.  Id.  That ruling was later invalidated by the Probate Court.  Id. at 30.

The Superior Court dismissed EOHHS's fraud claim, finding that the complaint alleged misrepresentations made only to Thibodeau, not to EOHHS itself.[4]  Id. at 184.  Later, the Superior Court entered summary judgment in favor of the defendants (including Kupperstein) on all but two of EOHHS's remaining claims.  Id. at 168-78.  Though the Superior Court concluded it could not invalidate or rescind the sale to Sheedy by Thibodeau, who had received title to the home by operation of her father's will, it noted that the home likely remained subject to the MassHealth lien under state law, "Thibodeau's sale to Sheedy notwithstanding," and it suggested EOHHS could file "a petition in Probate Court seeking a license to sell the Property to satisfy the Estate's debt."  Id. at 172-73.  After Kupperstein filed for bankruptcy, the Superior Court stayed its proceedings as to the remaining claims for unjust enrichment and statutory treble damages. Id. at 69-74.

Taking the Superior Court's advice, EOHHS went to the Probate Court.[5]  The Probate Court invalidated the transfer of the Norton home from Thibodeau to Sheedy, ruled the home remained an asset of the Estate, directed Thibodeau to sell the home to satisfy the MassHealth lien, and ordered Kupperstein and Sheedy to provide an accounting for, and pay to EOHHS, any rents received by leasing the home.  Id. at 25-29.  Kupperstein did not appeal the Probate Court's decision, nor did he comply with it.  Thereafter, proceedings in the Probate Court devolved into a series of contempt hearings and orders arising from Kupperstein's refusal to relinquish control over the Norton home.  EOHHS filed a complaint for contempt in June 2017, and the Probate

---

[4] Kupperstein mischaracterizes this ruling as having "absolved [him] of any fraud in the transaction" with Thibodeau.  Doc. No. 37 at 7; see also id. at 14 (claiming that fraud is "not present in this case, as the Suffolk Superior [C]ourt found").  The Superior Court, of course, did no such thing.

[5] Kupperstein accuses EOHHS of "blatant forum-shopping," saying the reason it "proceeded in both [Superior and Probate] courts is unclear."  Doc. No. 37 at 5.  But all one must do to discern the reason is read the Superior Court's summary judgment decision.

Court entered its first judgment finding Kupperstein in civil contempt of its prior order in August 2017 for refusing to return more than $33,000 in rents—money Kupperstein collected after having leased a property he did not rightly own. Id. at 41-42.

When the Probate Court refused to vacate its finding of contempt, id. at 107, Kupperstein turned to the Land Court. He fared no better there, though. His October 2017 complaint seeking to try title to the Norton home—in which he conveniently omitted any reference to the Probate Court's decision on that very subject—was promptly dismissed by the Land Court after EOHHS intervened and provided the information Kupperstein had withheld. Id. at 31-39. In addition to dismissing the action, the Land Court's December 21, 2017 order found Kupperstein's claims were frivolous and brought in bad faith, and that his willful failure to disclose the Probate Court's ruling and EOHHS's status as a lienholder was aimed at interfering with the Probate Court proceedings. The Land Court imposed sanctions of more than $9,000, reflecting attorney fees incurred by EOHHS and the Estate to intervene and respond to the Land Court action. Unsurprisingly, Kupperstein never paid the sanctions. Like the Superior Court, the Land Court stayed its own contempt proceedings when Kupperstein filed for bankruptcy, pending a determination by the Bankruptcy Court about the application of the automatic stay. Id. at 95-97.

While the Land Court case was pending, the Probate Court issued an order that, among other things, prohibited Kupperstein from executing or recording any documents regarding the Norton home without leave of court, nullified a deed purporting to convey the property from Sheedy to a trust controlled by Kupperstein, and prohibited Sheedy and Kupperstein from entering the property. Id. at 30. Upon dismissal of the Land Court action, the Probate Court again held Kupperstein in contempt, this time imposing a thirty-day sentence, which it suspended, and ordering Kupperstein to close all bank accounts associated with the property,

provide written confirmation and pay over all sums from those accounts to EOHHS, surrender any keys to the property, and provide any leases or other documents regarding the property to the Estate's lawyer.  Id. at 43.  When Kupperstein failed to comply with that order, the Probate Court ordered him to show cause why the thirty-day sentence should not be imposed and set a contempt hearing for January 12, 2018.  Id. at 43-44.

On the eve of that hearing, Kupperstein filed for bankruptcy.  He listed the Norton home as an asset.[6]

The Probate Court went forward with its contempt hearing, sent Kupperstein to jail for the afternoon, but then released him and reiterated its order to surrender keys and leases and pay back past rent for the property.  Doc. No. 55-14.  At the next contempt hearing, Kupperstein apparently made a cash payment toward the amount owed in past rent to avoid imprisonment, though he otherwise continued to defy the Probate Court's orders.[7]  He did not ask the

---

[6] This is not the only noteworthy thing about Kupperstein's initial bankruptcy petition.  He valued the Norton home at $350,000, claimed he was the only owner (through a trust), and identified less than $8,000 in other assets.  He listed neither of the two homes he apparently inhabits with his wife.  He listed no assets or interest in any law practice and claimed zero dollars in monthly income, though he is a practicing attorney.  With respect to creditors, he identified none with claims secured by the property he listed, ignoring MassHealth's lien on the Norton home.  He listed the Estate and EOHHS as creditors with claims of "unknown" value, nowhere identifying the specific amounts of rents, fees, and other sanctions he owed pursuant to the Land Court and Probate Court orders.
    Bankruptcy petitions are signed by the debtors "under penalty of perjury that the information provided is true and correct," and they warn debtors that "making a false statement [or] concealing property" can result in criminal fines and imprisonment under 18 U.S.C. §§ 152, 1341, 1519, and 3571.  Kupperstein signed and dated by hand both his petition and a separate declaration directly beneath paragraphs specifying those terms.  His electronic signature appears at a number of other locations on the petition and its schedules, also following paragraphs verifying the truth and completeness of the submission under penalty of perjury.

[7] EOHHS describes this as a $5,400 payment in cash, which Kupperstein pulled from his pocket in two plain white envelopes.  According to EOHHS, Kupperstein claimed the money had been given to him by Sheedy, but Sheedy did not confirm his claim.  It is unclear whether Kupperstein's possession of this cash, or his payment of it to the Probate Court, was disclosed to the Bankruptcy Court in March 2018.  The schedules submitted with his bankruptcy petition list

Bankruptcy Court at that time to enforce the automatic stay with respect to the Probate Court proceedings or to hold EOHHS or the Estate in contempt for continuing to participate in those proceedings.

On April 12 and May 10, 2018, the Probate Court issued orders finding Kupperstein in contempt for willfully violating its prior orders by continuing to execute documents regarding the property, entering and exercising control over the property, changing the locks, installing a new tenant, failing to pay the amounts due as prior contempt sanctions, and claiming the property as an asset in his bankruptcy petition. Doc. No. 11 at 45-50. The Probate Court imposed sanctions of $54,750 as restitution of funds stolen from the Estate (rent collected while unlawfully leasing the property), $10,485 in attorney fees incurred by EOHHS and the Estate as a result of Kupperstein's contempt, and statutory interest of $70,289.65. All three amounts were described by the Probate Court as contempt sanctions it believed were exempt from the Bankruptcy Court's automatic stay. The order of statutory interest was held in abeyance pending review of Kupperstein's compliance with the other aspects of the order, and the thirty-day sentence remained in play but was again suspended.

Thereafter, Kupperstein attempted to remove the various state court actions to the Bankruptcy Court, triggering motions by EOHHS and the Estate—both of whom had expressed their intent to file adversary complaints in the bankruptcy case—seeking to remand the actions to state court and requesting an order lifting the automatic stay or finding it inapplicable as to those state actions. While these motions were pending before the Bankruptcy Court, Kupperstein failed to appear for a continuation of his contempt hearing in Probate Court. Id. at 116. At a

---

monthly income (his wife's wages and his own Social Security) of less than $4,000, "cash in house" of $1,500, and bank accounts holding a total of about $600.

May 30, 2018 hearing, the Bankruptcy Court remanded the removed actions to their respective state courts and requested further briefing on the nature of the stay relief sought by the Estate and EOHHS.  During that hearing, Kupperstein (through counsel) agreed that the Norton home was not his property, was not an asset of the bankruptcy estate, and should be sold to satisfy the MassHealth lien.  The Bankruptcy Court granted limited relief from the automatic stay to permit the house to be sold.

In July 2018, Kupperstein filed a motion asking the Bankruptcy Court to hold EOHHS in contempt, arguing it had violated the automatic stay by continuing to participate in the Probate Court contempt hearings after learning Kupperstein had filed for bankruptcy.  Meanwhile, Kupperstein skipped another contempt hearing in Probate Court.  Doc. No. 55-18 at 3.

On August 13, 2018, the Bankruptcy Court granted the motions by EOHHS and the Estate seeking relief from the automatic stay.  It did so in virtually identical one-page orders finding "good cause" to allow the motions and providing:

> The actions presently pending in the Bristol County Probate and Family Court . . . and the Suffolk County Superior Court . . . may proceed in all respects, except movant may not seek to enforce against the debtor, Donald C. Kupperstein, any judgment with respect to the $191,741.79 MassHealth reimbursement claim or attempt to collect from Kupperstein all or any part thereof.  In all other respects the automatic stay with respect to the aforementioned proceedings is lifted, including the assessment by either court against Kupperstein of any restitution and sanction amounts and further proceedings to enforce and collect those amounts.  *See In re Di[ng]ley*, 852 F.3d 1143 (9th Cir. 2017); *Alpern v. Lieb*, 11 F.3d 689 (7th Cir. 1993).

Doc. No. 55-2.  Shortly thereafter, the Bankruptcy Court denied Kupperstein's request for a stay pending his appeal to this Court.[8]

---

[8] In so ruling, the Bankruptcy Court noted that Sheedy also had filed for bankruptcy, and another Bankruptcy Judge had granted stay relief to the Estate in that case to permit the same state-court actions to proceed.  See Doc. No. 55-21 (granting "relief from the stay to complete the probate matters . . . including all contempt proceedings, however they are characterized," because "contempt orders followed by sanctions are governed by 11 U.S.C. section 362(b)(4) (an order of

7

The Bankruptcy Court held a hearing on Kupperstein's motion for sanctions against EOHHS on August 21, 2018. It denied the motion the next day. The Bankruptcy Court found "that all proceedings in the Probate Court occurring after January 11, 2018, were initiated by the Probate Court" and "involved the Probate Court's efforts to enforce its orders entered against [Kupperstein] in the nature of sanctions imposed upon [him] for his repeated contempt of court." Doc. No. 55-4 at 2. Because such efforts are "an exercise of [the court's] police power," the Bankruptcy Court found that they are "excluded from the automatic stay by Bankruptcy Code § 362(b)(4)." Id. It considered the First Circuit cases upon which Kupperstein relied but reasoned that they precluded application of the police power exemption only "when the police power is exercised to further the governmental unit's 'pecuniary interest' or for a 'pecuniary purpose,'" and did not prevent a court from imposing "a monetary sanction to punish misconduct," where the court's aim is "to uphold the dignity of the court and the judicial process, to punish bad behavior and to educate the public in the importance of obeying court orders." Id. at 2-3. Because the Probate Court had not violated the automatic stay by continuing with its contempt proceedings, the Bankruptcy Court concluded that "EOHHS's involvement in those actions did not violate the stay." Id. at 4.

Kupperstein promptly appealed this ruling, too, and both appeals are now ripe for resolution on their merits.[9] As the Court's review is limited to the facts that were before the Bankruptcy Court at the time of its decisions, it need not recount here the events that unfolded

---

a governmental unit exercising its police or regulatory powers)," and "all court[s] have the inherent power to ensure compliance with their own orders").

[9] This Court previously dismissed Kupperstein's appeals, finding his status as a serial contemnor and a fugitive from the Probate Court disentitled him to this Court's review. Doc. No. 25. The First Circuit reversed and remanded the appeals to this Court for consideration on their merits. Doc. No. 32.

after those decisions issued.  Suffice it to say that Kupperstein's resistance to the state courts' orders did not abate.

## II.     LEGAL STANDARDS

### A.     Standard of Review

In general, a bankruptcy court's conclusions of law are reviewed de novo, its findings of fact are reviewed for clear error, and decisions or actions that are within its discretion are reviewed for abuse of that discretion.  In re San Miguel Sandoval, 327 B.R. 493, 505-06 (B.A.P. 1st Cir. 2005); accord In re Stevenson, 583 B.R. 573, 578 (B.A.P. 1st Cir. 2018).

The standard this Court applies in reviewing the Bankruptcy Court's order granting relief from the automatic stay depends on the basis upon which such relief was granted.  To the extent the Bankruptcy Court determined that the relevant state proceedings were within the police or regulatory power exception and, thus, beyond the reach of the automatic stay, this Court applies de novo review in construing the statutory exception.  In re Soares, 107 F.3d 969, 973 (1st Cir. 1997).  If, however, the Bankruptcy Court made a discretionary decision to lift the automatic stay for good cause shown, this Court reviews such a decision for abuse of discretion.  Id. at 973 n.4.

The same framework applies to this Court's review of the second order on appeal—the denial of Kupperstein's request for sanctions against EOHHS.[10]  To the extent the Bankruptcy Court determined that there was no violation of the automatic stay because the proceedings at issue were not encompassed by it, this Court reviews that legal conclusion de novo, and any findings of fact supporting it for clear error.  To the extent the Bankruptcy Court made a

---

[10] This order is appealable, and this Court has jurisdiction to review it, because "it conclusively determines a discrete dispute within the larger case."  In re San Miguel Sandoval, 327 B.R. 493, 505 (B.A.P. 1st Cir. 2005) (quotation marks omitted).

discretionary decision not to impose sanctions, this Court reviews that decision for abuse of discretion.  Id. at 973 n.4, 976.

"An abuse of discretion occurs when the [bankruptcy] court ignores a material factor deserving significant weight, relies upon an improper factor, or assesses all proper and no improper factors, but makes a serious mistake in weighing them."  In re Witkowski, 523 B.R. 300, 305 (B.A.P. 1st Cir. 2014).  A bankruptcy court's "discretion is necessarily broad," and only "limited circumstances" will merit reversal of decisions made in the exercise of such discretion. In re San Miguel Sandoval, 327 B.R. at 506 (quotation marks omitted).

### B.    The Bankruptcy Code

The automatic stay is described in 11 U.S.C. § 362(a), which provides:

Except as provided in subsection (b) of this section, a [bankruptcy] petition . . . operates as a stay applicable to all entities, of—

(1) The commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy] case . . . , or to recover a claim against the debtor that arose before the commencement of the [bankruptcy] case . . . ;

(2) The enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the [bankruptcy] case . . . ;

\*     \*     \*

(6) Any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the [bankruptcy] case . . . .

Twenty-eight exceptions to the automatic stay are enumerated in § 362(b), which provides that the filing of a bankruptcy petition "does not operate as a stay":

(1) Under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

\*     \*     \*

>  (4) Under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power . . . .

The Bankruptcy Code defines "governmental unit" as follows:

> The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(27).

Finally, in § 362(d), the Bankruptcy Code empowers a bankruptcy court to lift the automatic stay in certain circumstances:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under [§ 362(a)], such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) For cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

"Cause" is not defined, and it is not limited to the one specific example provided in the text of § 362(d)(1). In re Fin. Oversight & Mgmt. Bd. for P.R., 939 F.3d 340, 346-47 (1st Cir. 2019). Courts, including the First Circuit, have identified a number of factors that can "provide a helpful framework" for determining whether there is cause to lift the automatic stay, but the decision (and the factors) remain highly case-specific. Id.; accord In re Haines, 309 B.R. 668, 674 (Bankr. D. Mass. 2004).

III.     DISCUSSION

   A.     Automatic Stay Relief

In seeking relief from the automatic stay, the Estate and EOHHS argued that the pertinent state court actions were exempt from the stay (as either the equivalent of criminal contempt

11

proceedings under § 362(b)(1), or as actions by a government unit to enforce its police or regulatory power under § 362(b)(4)), and, in the alternative, that the stay should be lifted for good cause under § 362(d)(1). Doc. No. 11 at 211, 215-25, 229-32. On appeal to this Court, the parties focus their arguments on the applicability of § 362(b)(4), the so-called "police or regulatory power exception" to the automatic stay.[11]

The Bankruptcy Court's orders granting relief from the stay do not expressly invoke any specific provision of the Bankruptcy Code, but their language suggests the Bankruptcy Court rested its decision on both alternatives raised by the Estate and EOHHS—application of an exception under § 362(b)(4), and an act of discretion under § 362(d)(1). As to the former, the Bankruptcy Court cited In re Dingley and Alpern v. Lieb, both of which are decisions construing the police and regulatory power exception in § 362(b)(4). It pointed to those cases again when it subsequently ruled that EOHHS had not violated the automatic stay. The orders granting stay relief, however, did not pronounce the Probate Court and Superior Court actions "exempt" or "excluded" from, or "beyond the reach of," the automatic stay. Instead, the Bankruptcy Court emphasized having held a hearing, invoked the "good cause" standard, and ruled that the automatic stay was "lifted." Such language echoes the standard for granting relief from the

---

[11] The parties' concentration on this issue—and the First Circuit's previous characterization of the appeal—likely results from the Bankruptcy Court's citation to two cases applying that exception in its order granting stay relief, and its more substantial discussion of that exception in its order denying Kupperstein's contempt motion. Though their singular focus is understandable, it does not obligate this Court to limit its review to only that statutory exception, as it may affirm the order on appeal for any reason properly presented to the Bankruptcy Court and supported by the record. Perry v. First Citizens Fed. Credit Union, 304 B.R. 14, 17 (D. Mass. 2004). EOHHS argued at some length in its brief to the Bankruptcy Court that there was "cause" to lift the stay under § 362(d)(1), and Kupperstein responded to that argument in his brief opposing relief there as well. In re Kupperstein, No. 18-bk-10098, ECF Nos. 72, 73 (Bankr. D. Mass. June 29, 2018). This Court's close review of the underlying proceedings, including the briefing and arguments before the Bankruptcy Court and a careful parsing of the orders on appeal, leads it to take a broader view of the basis for the decision to grant stay relief.

automatic stay with respect to proceedings that otherwise would fall within it.  See § 362(d)(1) (requiring a hearing and permitting a Bankruptcy Court to grant relief from the automatic stay, upon "request of a party in interest," "for cause").  Additionally, the Bankruptcy Court used forward-looking language, allowing that the relevant actions "may proceed" and that the state courts may hold "further proceedings to enforce" the contempt sanctions.  It says nothing about events that previously occurred in state court.

In light of the foregoing, this Court reads the Bankruptcy Court's orders granting relief from the automatic stay as having rested—at least in part, as a separate and independent ground—on a discretionary determination that relief from the automatic stay was warranted "for cause" under § 362(d)(1).[12]  This Court reviews such a determination for abuse of discretion.

Before conducting such a review here, the Court notes that Kupperstein is the appealing party.  Despite EOHHS having expressly supported its motion for stay relief by invoking § 362(d)(1)—an argument to which Kupperstein responded before the Bankruptcy Court—and despite the prospective "lifting" language of the order being appealed as discussed above, Kupperstein limits his challenge on appeal to whether the police and regulatory power exception applies.  Nowhere in his briefs does Kupperstein acknowledge the alternative ground supporting the Bankruptcy Court's ruling, let alone establish an abuse of discretion.  Accordingly,

---

[12] This Court's interpretation of the order on appeal is further confirmed by an interaction between the Bankruptcy Court and the lawyers at a hearing on March 11, 2020, the audio of which is available on the Bankruptcy Court's docket.  In re Kupperstein, No. 18-bk-10098, ECF No. 141.  At that hearing, the Bankruptcy Judge learned of Kupperstein's recent arrest on a capias issued for yet another failure to appear in Probate Court, and of the imposition (finally) of the Probate Court's thirty-day sentence for contempt.  The Bankruptcy Court also was advised that there were approximately $135,000 in contempt sanctions outstanding, and that Kupperstein could purge his contempt and secure his release by paying those sanctions.  Besides confirming that no actions were being undertaken in state court to collect the amount of the MassHealth lien, the Bankruptcy Judge expressed no concerns or reservations about the Probate Court's actions vis-à-vis the pending bankruptcy and his order lifting the stay.

Kupperstein has waived any challenge to the lifting of the stay for cause pursuant to § 362(d)(1). His waiver alone justifies AFFIRMING the Bankruptcy Court's order granting stay relief on that ground.

Even if the Court were inclined to excuse Kupperstein's waiver (and it does not), it would find no abuse of discretion by the Bankruptcy Court. The circumstances presented here include at least several features which favor finding cause to lift the stay. First, Kupperstein's pattern of disregarding, circumventing, and/or violating outright the clear orders of the Probate Court has provoked nearly every court presented with issues involving or arising therefrom to comment on the outrageousness of his actions. The Probate Court's interest in upholding its dignity and punishing this level of serial contempt for its orders is substantial, and allowing it to pursue proceedings designed with that aim in mind is sensible. Second, a substantial portion (approximately one-third) of the total contempt sanctions imposed by the Probate Court essentially seeks the return of funds that never were Kupperstein's in the first place and, thus, are not properly part of his bankruptcy estate. More than $50,000 of the sanctions are for rent Kupperstein collected, having unlawfully leased the Norton home (which, as he eventually conceded to the Bankruptcy Court, was not his to rent), and having continued to do so despite clear orders of the Probate Court to cease and surrender all past and future rents. Third, it appears plain that Kupperstein's conduct, from 2014 to the present, has directly and meaningfully harmed the Estate and EOHHS (not to mention Thibodeau) by requiring them to endure what the First Circuit described as "legal whack-a-mole" in order to wrest the Norton home from Kupperstein's grip and, now, repair the damage his transgressions have caused. Finally, the Estate and EOHHS have represented here and to the Bankruptcy Court that probate

of the Estate cannot be completed while the Probate Court action, including the contempt proceedings, remains unfinished.

No abuse of discretion could arise from concluding that a balancing of the equities here strongly disfavors Kupperstein, or that consideration of any set of helpful factors yields a finding of cause sufficient to warrant lifting the automatic stay. Cf. In re Soares, 107 F.3d 969, 975 (1st Cir. 1997) (acknowledging "that bankruptcy courts traditionally pay heed to equitable principles"). Kupperstein has not established, nor does the record reveal, any material factor that the Bankruptcy Court failed to consider, any improper factor upon which the Bankruptcy Court relied, or any basis to find the Bankruptcy Court erred in its weighing of the pertinent facts. Accordingly, the Bankruptcy Court's order granting stay relief for cause pursuant to § 362(d)(1) is AFFIRMED.

Given this Court's reading of the order granting relief from the stay, and its affirmance thereof, the Court need not resolve the thornier question of whether the police and regulatory power exception to the automatic stay in § 362(b)(4) applies and separately supports the Bankruptcy Court's decision to lift the stay.[13]

---

[13] Though many courts, including the First Circuit, have interpreted the relevant exception, far fewer have considered whether and how it applies to civil contempt proceedings that arise from findings of pre-petition misconduct. The Seventh and Ninth Circuits, in decisions discussed by the parties and cited by the Bankruptcy Court here, have found such proceedings exempt from the automatic stay under § 362(b)(4) "when the proceedings are intended to effectuate the court's public policy interest in deterring litigation misconduct." In re Dingley, 852 F.3d at 1147-48; see Alpern v. Lieb, 11 F.3d at (reaching the same conclusion for sanctions, even if pecuniary, "meted out by a governmental unit, the court . . . in order to punish unprofessional behavior"). The parties have cited, and this Court has found, no other Circuit Court decisions directly addressing such circumstances. Although two bankruptcy judges in the District of Massachusetts have cited the same exception when permitting state-court proceedings to continue as to both Kupperstein and Sheedy, two other bankruptcy judges within the First Circuit have read the exception more narrowly. See In re McKenna, 566 B.R. 286, 289 (Bankr. D.R.I. 2017) (finding "proceedings to determine the imposition of sanctions and the nature of such sanctions" are exempt under § 362(b)(4), but "proceedings to enforce and collect monetary sanctions that have already been

B.     Denial of Sanctions

In July 2018, while the motions for stay relief were pending in the Bankruptcy Court, Kupperstein moved for a finding that EOHHS had violated the automatic stay by continuing to participate in Probate Court proceedings after Kupperstein filed for bankruptcy.[14]  After a hearing, the Bankruptcy Court demurred in a second order which Kupperstein brings to this Court for review.

Though the Probate Court's contempt hearings originally were triggered by a complaint EOHHS filed before Kupperstein instituted bankruptcy proceedings, the record confirms the Bankruptcy Court's factual finding that EOHHS did nothing post-petition to instigate further proceedings or request new sanctions.  Rather, it participated in continued proceedings as required by the Probate Court.

In finding this participation did not warrant a contempt finding or sanctions, the Bankruptcy Court first examined whether the post-petition actions the Probate Court had taken were within the scope of the automatic stay.  Finding that the Probate Court was a "governmental unit" acting to enforce a sanction it had imposed "to punish misconduct" as "an exercise of its police power"—and not for the court's own pecuniary interest—the Bankruptcy Court ruled its actions had not violated the automatic stay.  In so concluding, the Bankruptcy Court quoted Judge Posner, writing for the Seventh Circuit in Alpern, who warned against construing the

---

imposed" are not); In re Birchall, No. 07-bk-13232, 2007 WL 1992089, at *9 (Bankr. D. Mass. July 3, 2007) (finding civil contempt proceedings within the scope of the automatic stay after noting a split of authority among other District and Bankruptcy Courts, but explaining the stay could be lifted as to such proceedings for cause including "recovery of embezzled property").

[14] It bears noting that Kupperstein made no such motion—nor, it appears from the Bankruptcy Court's docket, lodged any complaint at all—in January 2018 (after he was jailed for an afternoon by the Probate Court the day after filing his bankruptcy petition), or in March 2018 (after he appeared in Probate Court and ultimately paid cash toward the rent he had essentially stolen by leasing a property he did not own).

police and regulatory power exception to the automatic stay in a manner which would encourage litigants to resort to "the expedient of declaring bankruptcy" in an effort "to delay the imposition of sanctions [for their unprofessional conduct in litigation] indefinitely." 11 F.3d at 690.  Having determined the Probate Court's contempt proceedings were not barred by the stay, the Bankruptcy Court found EOHHS had not willfully violated the stay by participating in those proceedings at the Probate Court's direction.

In reaching this decision, the Bankruptcy Court (necessarily) considered those actions of the Probate Court occurring between January 11, 2018 (the date on which Kupperstein filed his bankruptcy petition) and August 13, 2018 (the date on which the Bankruptcy Court lifted the stay as to the Probate Court proceedings).  In that time, the Probate Court: 1) held a January 12, 2018 hearing at which it found Kupperstein in contempt for failure to surrender keys and leases for the Norton home; 2) held a March 9, 2018 hearing at which it found Kupperstein in contempt for failure to turn over leases for the Norton home and rent he collected while leasing it despite not owning it; 3) requested and received from EOHHS a brief regarding the impact of the bankruptcy on the Probate Court contempt proceedings; 4) issued two contempt orders listing numerous ways in which Kupperstein had violated past orders (the bulk of which imposed nonmonetary requirements), determining the nature of the sanctions to impose, and suspending a thirty-day sentence pending further hearing; and 5) held two further contempt hearings on May 18, 2018 and July 6, 2018 at which warrants were issued for Kupperstein's failure to appear and a license was granted for the sale of the Norton home.  Doc. No. 11 at 45-50, 116, 187-95; Doc. No. 55-14; Doc. No. 55-18.

Considering both the scope of the misconduct to which the Probate Court was responding and the nature of the actions and orders in the relevant time period, the Bankruptcy Court neither

erred in its legal analysis of the Probate Court's actions nor abused its discretion in determining that contempt sanctions were not warranted against EOHHS. The Probate Court plainly was acting to vindicate its authority to enforce its own orders, not to further its own pecuniary interests.[15] Its orders during the relevant time period required Kupperstein to surrender keys and documents associated with a property that was not his and to repay rent he essentially stole from the Estate by wrongly leasing that property. The Probate Court also assessed (but did not collect) other monetary sanctions it specified were intended as penalties for Kupperstein's contempt.[16] Moreover, the same reasons cited above as support for the Bankruptcy Court's discretionary determination that stay relief was warranted also support its decision to deny Kupperstein's request for contempt sanctions.[17]

Accordingly, the Bankruptcy Court's order denying Kupperstein's motion for contempt and sanctions is AFFIRMED.

---

[15] EOHHS also is a "governmental unit" for purposes of the police and regulatory power exception to the stay. And, it appears that EOHHS likewise has a valid, non-pecuniary purpose in seeing Kupperstein's contumacious behavior penalized, and in ensuring the regulations governing the MassHealth program are fairly administered and are not willfully circumvented or undermined to the detriment of program participants and the public at large.

[16] Even In re McKenna, a case upon which Kupperstein relies, supports a finding that these actions by the Probate Court (or by EOHHS in appearing at the relevant hearings) were within the reach of the police and regulatory power exception. See 566 B.R. at 289 (distinguishing between "proceedings to determine the imposition of sanctions and the nature of such sanctions" and those undertaken "to enforce and collect monetary sanctions that have already been imposed").

[17] Kupperstein cited 11 U.S.C. §§ 105 and 362(k) as the bases for his contempt motion in the Bankruptcy Court. The former empowers the Bankruptcy Court to do various things aimed at carrying out its duties under the Bankruptcy Code and enforcing its orders, but such actions are left to its discretion; nowhere does § 105 require a finding of, or a particular sanction for, contempt. The latter requires an award of "actual damages" and permits punitive damages where a debtor is "injured by any willful violation of a stay." § 362(k)(1). The record here does not establish a "willful" violation, nor does it establish any injury Kupperstein suffered due to EOHHS's actions (as opposed to his own repeated flouting of the Probate Court's orders).

IV.     CONCLUSION

In sum, Kupperstein cannot escape the consequences of his consistent contempt for the Estate, EOHHS, and multiple Massachusetts courts, and his serial defiance of valid court orders. His misconduct underlying this case alone spans more than five years, and the published decisions of other courts suggest it is part of a pattern that began long before Kupperstein arrived at Thibodeau's house in 2014.

Two decades earlier, a different United States Bankruptcy Judge in this District found "cause to consider whether the Debtors and their attorney, Mr. Kupperstein, acted with fraudulent intent" in omitting a significant tort claim from their bankruptcy schedules. In re Jeffrey, 176 B.R. 4, 5 n.2 (Bankr. D. Mass. 1994). In 2011, Justice Spina of the Massachusetts Supreme Judicial Court entered an order suspending Kupperstein's law license for one year for intermingling client and personal funds without keeping required records, as well as negligently and intentionally misusing client funds in two cases between 2002 and 2008. In re Kupperstein, No. BD-2011-086, 2012 WL 13104933, at *1-2 (Mass. Dec. 18, 2012). And, in 2018, a Justice of the Massachusetts Land Court found Kupperstein had made "false or misleading representations," had drafted and sent to local officials a letter making false claims, had forged a deed and submitted it to a state court, and had represented both parties to an unlawful real estate transaction. Braxton v. City of Bos., No. 17 MISC 320, 2018 WL 1221083, at *8-9 (Mass. Land Ct. 2018).[18] The circumstances presented here and the misconduct described in the other cases

---

[18] The events at issue in Braxton arose in 2015 and 2016, close in time to the events underlying this case, and they also involved efforts to purchase a property encumbered by a local tax lien after its owner had died. 2018 WL 1221083, at *3-5.

are especially egregious given Kupperstein's ethical obligations as an attorney and officer of the court who (per the BBO's website) remains licensed to practice law in Massachusetts.[19]

The Bankruptcy Court's orders are AFFIRMED.

SO ORDERED.

  /s/ Leo T. Sorokin
United States District Judge

---

[19] The Court also observes that Kupperstein's attorney has demonstrated, in both this Court and the Bankruptcy Court, a consistent tendency to denigrate his opposing counsel, for example by criticizing the style or quality of their written submissions rather than simply challenging the merits of their legal arguments. E.g., Doc. No. 54 at 3 n.1 (accusing opposing counsel of "grammatical errors that occasionally render their argument somewhat nonsensical"); Doc. No. 11 at 126 (accusing opposing counsel of "flagrant, hyperbolic and hysterical use of adjectives" and arguing opposing counsel "so intermingled dubious factual assertions with minimal, conclusory and incorrect assertions of law that a cogent response is nearly impossible"). Mr. Baker is a member of the Massachusetts bar, bound to conform his conduct to the Massachusetts Rules of Professional Conduct. Paragraph 4 of the Preamble to those rules admonishes lawyers to "demonstrate respect for the legal system and for those who serve it, including . . . other lawyers." Mr. Baker would do well to adhere more closely to that standard in his written and oral advocacy.

Additionally, both the Rules of Bankruptcy Procedure and the Local Rules of this Court require parties to support statements of fact in their briefs and memoranda with references and citations to the record. Fed. R. Bankr. P. 8014(a)(6), (8); D. Mass. L.R. 7.1(b)(1). Mr. Baker totally disregarded those rules. There is not a single record citation in Mr. Baker's merits brief or his reply. See generally Doc. No. 37; Doc. No. 54. This is not a mere technicality. It required the Court to scour the record itself in search of support for numerous factual representations made in the briefs, and the Court's scouring in many instances yielded record evidence demonstrating the misleading nature of the statements in the briefs. See, e.g., notes 4 and 5, supra. In the future, Mr. Baker should ensure his own compliance with the relevant rules of procedure before casting aspersions against his opponents for noncompliance with those very same rules. See Doc. No. 54 at 3 (accusing opposing counsel of failing to "include a summary of the argument as required by Fed. R. Bankr. P. 8014(b)).